## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

GENWORTH FINANCIAL, INC.      )
CONSOLIDATED DERIVATIVE         )     **C.A. No. 11901-VCS**
LITIGATION                        )

## MEMORANDUM OPINION

Date Submitted: June 18, 2021
Date Decided: September 29, 2021

P. Bradford deLeeuw, Esquire of deLeeuw Law LLC, Wilmington, Delaware; David R. Scott, Esquire of Scott+Scott Attorneys At Law LLP, Colchester, Connecticut; Thomas L. Laughlin IV, Esquire and Scott Jacobsen, Esquire of Scott+Scott Attorneys At Law LLP, New York, New York; Robert C. Schubert, Esquire, Willem F. Jonckheer, Esquire and Dustin L. Schubert, Esquire of Schubert Jonckheer & Kolbe LLP, San Francisco, California; Robert B. Weiser, Esquire and James M. Ficaro, Esquire of The Weiser Law Firm P.C., Berwyn, Pennsylvania; Brett D. Stecker, Esquire of Shuman, Glenn & Stecker, Ardmore, Pennsylvania; Michael I. Fistel, Jr., Esquire of Johnson & Weaver, LLP, Marietta, Georgia; and Corey D. Holzer, Esquire of Holzer & Holzer, LLC, Atlanta, Georgia, Attorneys for Plaintiffs International Union of Operating Engineers Local No. 478 Pension Fund, Richard L. Salberg, M.D. and David Pinkoski.

Srinivas M. Raju, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware and Greg A. Danilow, Esquire, Caroline Hickey Zalka, Esquire, John A. Neuwirth, Esquire, Evert J. Christensen, Jr., Esquire and Amanda K. Pooler, Esquire of Weil, Gotshal & Manges LLP, New York, New York, Attorney for Nominal Defendant Genworth Financial, Inc. and Defendants Thomas J. McInerney, William H. Bolinder, G. Kent Conrad, Melina E. Higgins, Nancy J. Karch, Christine B. Mead, David M. Moffet, Thomas E. Moloney, James A. Parke, James S. Riepe, Michael D. Fraizer, Martin P. Klein and Kelly L. Groh.

**SLIGHTS, Vice Chancellor**

In this stockholder derivative action ostensibly brought on behalf of Genworth Financial, Inc. ("Genworth" or the "Company"), it is alleged that officers and directors of Genworth breached their fiduciary duties owed to Genworth and its stockholders by causing the Company to disclose materially false information to the public regarding the fitness of its long-term care insurance business. Separately, these same officers and directors allegedly breached their fiduciary duties by causing the Company to manipulate data regarding the *bona fides* and timing of an initial public offering relating to the Company's Australian mortgage insurance business. Both breaches, it is alleged, caused substantial harm to Genworth and its stockholders. Defendants move to dismiss the derivative complaint for failure properly to plead demand futility under Court of Chancery Rule 23.1 and failure to state viable claims under Court of Chancery Rule 12(b)(6).

For the reasons set forth below, Defendants' motion must be granted. While Plaintiffs' theory of liability has moved with the wind, it is clear upon submission of this motion that Plaintiffs are alleging Genworth fiduciaries intentionally caused the Company to engage in wrongdoing. As pled, this is not, as Plaintiffs variously have maintained, a failure of oversight case under *Caremark*.[1] This is, instead, an attempt

---

[1] *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996).

1

at a bad faith claim based on intentional breaches of fiduciary duty. In Delaware, the sustainable bad faith claim is a "*rara avis*."[2] When considered against the documents properly incorporated by reference, Plaintiffs' complaint presents nothing approximating a "rare bird" sighting. To the extent Plaintiffs intended to bring separate claims against the Genworth officers named as defendants in the complaint, the serial group pleading and failure to separate any claim against officers leaves the Court with no basis to evaluate the *bona fides* of officer liability here.

## I. BACKGROUND

I have drawn the facts from well-pled allegations in the Verified Second Amended Complaint (the "Complaint") and documents properly incorporated by reference or integral to that pleading.[3] For purposes of the motion, I accept as true the Complaint's well-pled factual allegations and draw all reasonable inferences in the Plaintiffs' favor.[4]

---

[2] *In re Chelsea Therapeutics Int'l Ltd. S'holders Litig.*, 2016 WL 3044721, at *1 (Del. Ch. May 20, 2016).

[3] Verified Second Am. S'holder Deriv. Compl. ("Compl.") (D.I. 32); *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (noting that on a motion to dismiss, the Court may consider documents that are "incorporated by reference" or "integral" to the complaint).

[4] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002).

## A. Parties

Plaintiffs, International Union of Operating Engineers Local No. 478 Pension Fund, Richard Salberg, M.D., David Pinkoski and Martin Cohen, currently hold and have held common stock in Genworth throughout all times relevant to the claims asserted in the Complaint.[5]

Nominal Defendant, Genworth, a Delaware company with headquarters in Richmond, Virginia, is a large insurance provider, specializing in life insurance, long-term care ("LTC") insurance and mortgage insurance ("MI").[6] As of the date of the Complaint, it was the country's largest provider of LTC insurance.[7] Genworth's common stock trades on the New York Stock Exchange.[8]

Defendant, Thomas McInerney, has served as President and CEO of Genworth, as well as a director on Genworth's board of directors (the "Board"), since 2013.[9] In July 2014, upon the resignation of James Boyle, McInerney also

---

[5] Compl. ¶¶ 10–13.

[6] Compl. ¶ 14.

[7] *Id.*

[8] *Id.*

[9] Compl. ¶ 15.

3

became CEO of Genworth's U.S. Life Insurance Division and head of its LTC insurance business.[10]

Defendants, William Bolinder, Gaylord Kent Conrad, Melina Higgins, Mancy Karch, Christine Mead, David Moffett, Thomas Moloney, James Parke and James Riepe, each served on the Board at the time this lawsuit was brought.[11] Bolinder, Conrad, Higgins, Moffett and Moloney served on Genworth's Risk Committee, and Mead, Moloney, Parke and Riepe each served on Genworth's Audit Committee.[12]

Defendant, Michael D. Fraizer, served as the President, CEO and Chairman of the Board from May 2004 to May 2012.[13] Defendant, Martin Klein, served as interim President and CEO upon Fraizer's departure and until McInerney assumed these roles.[14] He served as CFO from May 2011 until his departure in October 2015.[15] Defendant, Kelly Groh, has served as CFO since Klein's departure. She previously served as Genworth's controller and principal accounting officer

---

[10] *Id.*

[11] Compl. ¶¶ 16–24.

[12] *Id.*

[13] Compl. ¶ 25.

[14] Compl. ¶ 26.

[15] *Id.*

beginning in May 2012, and she has held a variety of other roles at Genworth going back to 2004.[16]

## B. The LTC Allegations

As noted, Plaintiffs allege Defendants intentionally breached their duty of loyalty by knowingly causing the Company to issue materially false and misleading information regarding the fitness of Genworth's LTC insurance business. These false and misleading disclosures prompted civil enforcement actions that exposed the Company to substantial liability. The Complaint's allegations in this regard are summarized below.

### 1. The LTC Industry and Genworth's Involvement

Starting in the 1970s, several insurance companies began selling LTC insurance under a model where policyholders would pay periodic premiums over a number of years in return for what the insurers expect will be a relatively brief period of long-term care insurance coverage in the future.[17] LTC insurance can be applied to stays at nursing homes, assisted-living facilities or in-home care.[18] By 2013, a number of insurance providers stopped offering LTC policies upon discovering that policyholders were staying "on claim" longer than underwriters anticipated and

---

[16] Compl. ¶ 27.

[17] Compl. ¶ 32.

[18] *Id.*

5

generally were not allowing their policies to lapse before the coverage became available.[19]   As other carriers left the LTC insurance market, Genworth doubled-down.[20]   Indeed, on September 25, 2013, McInerney announced at an investor conference that "[Genworth's] core business is long-term care."[21]

## 2. LTC Reserves

Insurance carriers offering LTC insurance are subject to a unique set of regulations.[22]   One primary area of regulation relates to the maintenance of reserves to pay future claims.[23]   There are two types of reserves related to LTC insurance: (1) a disabled life reserve ("DLR"), which is used to pay policies where policyholders have already started making claims, and (2) an active life reserve ("ALR"), which is used to pay future claims on existing policies where policyholders have yet to begin making claims.[24]   Under GAAP rules, as reserves are increased,

---

[19] Compl. ¶ 33.

[20] Compl. ¶ 35.

[21] *Id.*

[22] Compl. ¶ 39.

[23] *Id.*

[24] *Id.*

an expense must be recorded on the company's income statement, which ultimately affects overall profitability.[25]

As the U.S. Department of Health & Human Services explained in a July 2013 study, "even small errors" in inputs to a company's reserve calculations can "lead to major changes in the product's underlying profitability."[26] That is why, at least in part, GAAP, as well as corresponding SEC disclosure rules mandating conformance with GAAP, require that "[a]n insurance entity shall regularly evaluate estimates used and adjust the additional liability balance, with a related charge or credit to benefit expense, if actual experience or other evidence suggests that earlier assumptions should be revised."[27] According to Plaintiffs, this requires that Genworth regularly update its experience data regarding the average duration of claims and policy lapse rates.[28] GAAP also requires that Genworth promptly revise reserve inputs and increase its reserves to take into account its new experience data.[29]

---

[25] Compl. ¶ 40.

[26] *Id.*

[27] Compl. ¶ 42 (alteration in original); *Financial Accounting Standards Board Accounting Standards Codification* 944-40-35-9.

[28] Compl. ¶ 43.

[29] Compl. ¶ 44.

### 3. Board Knowledge of LTC Decline in 2011 and 2012

In April 2011, management "held a long-term care insurance educational session with many of the Directors."[30]  The following month, at a May 18, 2011 Board meeting, the Board (which then included 9 of the 10 directors sued here) discussed "potential key risks, 'including earned investment rate, mortality, lapse rate, and morbidity,'" all of which "impact[ed]" DLRs.[31]  Later that year, during a December 7, 2011 Audit Committee meeting, and subsequent discussion with the Board, then-CEO Fraizer expressed his concerns regarding "the long-term care insurance old performance," and he "alert[ed] the Board to the fact that the Company's experience data for its older LTC insurance products showed adverse results."[32]  At the same meeting, Genworth's Chief Actuary provided the Audit Committee, and subsequently the Board, with an actuarial update and discussed Genworth's LTC current experience data and the adequacy of reserves.[33]

---

[30] Compl. ¶ 46.

[31] *Id.*

[32] Compl. ¶ 47 (cleaned up).

[33] Compl. ¶ 48; Defs.' Opening Br. in Supp. of Mot. to Dismiss the Second Am. Compl. ("OB") (D.I. 37), Ex. 16 (Dec. 7, 2011 Audit Committee Minutes).

"This marked the last time the [Board] ever received an update on the Company's [LTC] current experience data."[34]

In early 2012, Genworth altered its reserve methodology to reject deteriorating claims experience evidenced during 2009–2010.[35] As a result of certain management plans and one-time actions taken in 2011, the Board assumed that Genworth's future benefit claims would perform at pre-2009 levels.[36] This decision ultimately was recommended and approved by the firm hired by the Company to review its methodology for calculating LTC reserves, PricewaterhouseCoopers ("PwC")—a recommendation and decision that PwC later said in a July 2014 report was flawed.[37] Genworth continued to use the old experience data throughout the relevant time period leading up to the false and misleading disclosures at issue here.

In October 2012, the Audit Committee received a 2012 LTC actuarial review, which, in turn, was shared with the entire Board by the Chairman of the Audit Committee, Parke.[38] The Board was told that the reserves had been calculated based

---

[34] Compl. ¶ 48.

[35] Compl. ¶ 37.

[36] *Id.*

[37] *Id.*

[38] Compl. ¶ 49.

upon assumptions rather than actual experience data.[39] Then, during an October 29, 2012 special meeting of the Audit Committee, Genworth's controller reported on the "potential control failures" in the internal control evaluation involving the LTC actuarial process.[40] The Audit Committee was told that "management and KPMG were still reviewing the matter to determine if there was a material weakness in internal controls."[41]

At the next regularly scheduled Audit Committee meeting, on December 5, 2012, Genworth's controller reported "six separate control deficiencies identified in the Company's LTC insurance business, constituting two significant control deficiencies."[42] These deficiencies related to the "projection process and procedure" and the "reserve valuation processes and procedures."[43] The Audit Committee asked the Chief Actuary to prepare a report summarizing the LTC actuarial presentation and to provide a timetable for when Genworth's controller would present a report to

---

[39] *Id.*

[40] Compl. ¶ 50.

[41] *Id.* KPMG served as the Company's independent auditor during the relevant time period. Compl. ¶ 128. As discussed below, KPMG was present in Board meetings throughout the relevant time during which the Board was advised of Company practices related to LTC reserves.

[42] Compl. ¶ 51. KPMG attended this meeting and "discussed its review process and perspectives on the . . . LTC deficiencies." OB Ex. 21, at 05059.

[43] Compl. ¶ 51.

the Audit Committee regarding the status of each of the LTC actuarial projects.[44]

This development was reported to the full Board the following day.[45]

### 4. The Board Receives Reports Regarding the LTC Deficiencies While McInerney Provides False Assurances to Investors

On February 15, 2013, the Board held a regularly scheduled meeting and again discussed the LTC business and reserves.[46]  On February 25, 2013, Genworth's controller reported to both the Board and Audit Committee at a joint special meeting on "five significant deficiencies" identified in 2012 related to "long-term care insurance actuarial valuation" and "LTC projections."[47]  Then, at the March 12, 2013 Audit Committee meeting, the Audit Committee received an update where it was reported: "Complete morbidity assumption update (not completed in 2012).  Will impact Valuation (Reduce Reserves for New Business) . . . ."[48]  According to Plaintiffs, this suggests the Audit Committee members (relevant here, Mead, Moloney, Parke and Riepe) knew the LTC Actuarial Projections were based upon

---

[44] Compl. ¶ 52.

[45] Compl. ¶ 51.

[46] Compl. ¶ 56.

[47] *Id.* (alteration omitted).  Again, the meeting minutes relied upon for this allegation reflect KPMG's attendance and involvement.  OB Ex. 14.  According to the minutes, KPMG agreed with management's conclusion that "no material weaknesses had been identified during 2012."  *Id.* at 04877.

[48] Compl. ¶ 60.

stale assumptions of morbidity rates that would impact the amount of reserves.[49]

Notwithstanding the multitude of presentations about potential reserve issues, on May 1, 2013, McInerney told investors, "[w]e believe reserves for both GAAP and [on a statutory basis] were adequate."[50]

On July 29, 2013, the Audit Committee met again, and KPMG reported on "new deficiencies identified relating to the Corporation's long term care insurance reserves."[51] On the next day, Genworth announced its earnings results for the second quarter of 2013.[52] On August 1, McInerney again attended an investor conference where he acknowledged that investors were focused on LTC and reported, "[w]e are conducting an intense, very broad and deep review of all aspects of our LTC insurance business."[53]

---

[49] *Id.*

[50] Compl. ¶ 61 (alterations in original). McInerney reiterated this point at another investor conference held on July 31, 2013. *Id.*

[51] Compl. ¶ 62 (alterations omitted). Although not pled by Plaintiffs, KPMG went on to report that "there were no material weaknesses" and that KPMG "was comfortable with the contents of the Corporation's Form 10-Q" for the second quarter of 2013. OB Ex. 26, at 04913.

[52] Compl. ¶ 63.

[53] *Id.* (alteration in original).

During an October 9, 2013 meeting, the Board discussed certain LTC disclosure issues with management and the chief actuary.[54] Later that month, McInerney stated at yet another investor conference that the Company had started an intensive review of its LTC business, including the reserves.[55]

**5. The November Board Meetings and McInerney's December Presentation**

On November 21, 2013, Klein sent the Board a draft of the slides McInerney intended to use at an investor presentation to be made on December 4, 2013 (the "December 2013 Presentation").[56] Klein indicated that the presentation was intended to "address key points on margins and assumptions that go into testing" and that the Board should be prepared to review the presentation at a November 25, 2013 special Board meeting.[57]

According to Plaintiffs, the slides themselves made a number of false representations. First, the December 2013 Presentation represented that "all data" was "as of September 30, 2013" and that Genworth revised its "actuarial assumptions" as "circumstances warrant . . . based on our monitoring of actual

[54] Compl. ¶ 65.

[55] Compl. ¶ 66.

[56] Compl. ¶ 69.

[57] *Id.*

13

experience."[58]  Contrary to this representation, the Board purportedly knew, based on its prior meetings regarding reserve deficiencies, that it was using data from 2010 or earlier to calculate its loss reserves and was assuming LTC insurance claimants would stay on claim for only 2.2 years, when it knew claimants actually stayed on claim for 2.9 years.[59]  There were a multitude of other allegedly false statements made in the presentation, all regarding the size and adequacy of reserves and the assumptions utilized to calculate those reserves.[60]

On November 25, 2013, the Board met to discuss, among other things, the December 2013 Presentation.  A variety of officers, including McInerney and Genworth's Chief Actuary, explained the presentation and discussed the LTC reserves.[61]  The meeting minutes confirm that the actuarial team was involved in the presentation and was comfortable with the numbers presented.[62]  At the same meeting, the Board discussed the recommendation of the Audit Committee and

---

[58] Compl. ¶ 70.

[59] *Id.*

[60] Compl. ¶ 72 (alleging as false the December 2013 Presentation's statement that "margins remain strong in aggregate under key sensitivities"); Compl. ¶ 73 (alleging the Board knew that Genworth's LTC insurance claims lasted an average of three years, as evidenced by 10-Ks from 2010, 2011 and 2012).

[61] Compl. ¶¶ 76–77.

[62] OB Ex. 28.

management to proceed with a $400-450 million debt offering in early December 2013 to "satisfy GSE capital requirements."[63]

On December 4, 2013, McInerney delivered the December 2013 Presentation during an investor call.[64] He announced that Genworth had "completed the very intensive, broad and deep review of [its] long-term care insurance business" and that Genworth had "refined and improved [its] reserving . . . based on analyzing and using [its] significant data on consumers, underwriting and claims."[65] McInerney specifically referenced the slide deck throughout his presentation, giving the impression that the reserve review was based on current claims experience data, rather than the stale pre-2010 data.[66] The following week, during the December 12–13, 2013 Board meetings, the Board was briefed on investors' and analysts' positive reactions to the December 2013 Presentation.[67]

---

[63] Compl. ¶ 74.

[64] Compl. ¶ 79.

[65] *Id.*

[66] Compl. ¶ 81.

[67] Compl. ¶¶ 86–87.

### 6. The 2013 Form 10-K

On February 25, 2014, the Audit Committee and the Board held a special joint meeting to review Genworth's Form 10-K for the year ending December 31, 2013.[68] Genworth's controller, Groh, led the discussion regarding "management's assessment of internal controls over financial reporting" and, "throughout the presentation, the Board and the Committee asked questions, to which Ms. Groh, Mr. Klein and [KPMG] responded."[69] The Board approved the filing of the Form 10-K, and the entire Board signed the document.[70]

According to Plaintiffs, Genworth's 2013 Form 10-K contained a number of false statements. First, it indicated that the filing was prepared "in accordance with U.S. GAAP" and, specifically, that "reserves for estimated future payments of claims to our policyholders and contract holders" were set "in accordance with U.S. GAAP and industry accounting practices."[71] Second, the filing stated that the Company "monitor[s] actual experience and when circumstances warrant, revise[s] [its] assumptions."[72] And, third, it noted that Genworth's "internal control over

---

[68] Compl. ¶ 88.

[69] *Id.* (alteration omitted).

[70] Compl. ¶ 89.

[71] Compl. ¶ 90.

[72] Compl. ¶ 91.

16

financial reporting was effective as of December 13, 2013."[73]   Each of these statements was false, according to Plaintiffs, because Genworth did not update its reserves to reflect its current claims or experience data as required by GAAP.[74]  And the Board purportedly knew these statements were false because its members knew that Genworth was relying upon stale claims data.[75]

### 7. The Falsity of the Disclosures Revealed

In January 2014, Genworth hired James Boyle as CEO of its U.S. Life Insurance Division, which included the LTC business.[76]  Lynne Patterson was hired shortly thereafter as the division's interim CFO.[77]  From January to June 2014, Boyle and Patterson reviewed Genworth's actuarial assumptions and determined that the reserves reported in the December 2013 Presentation were understated by as much as $1 billion.[78]  On June 16, 2014, Patterson and Boyle met with Genworth's CFO, Klein, to discuss their concerns and report that prior assumptions, including those

---

[73] Compl. ¶ 92.

[74] Compl. ¶¶ 90–92.

[75] Compl. ¶¶ 6, 90.

[76] Compl. ¶ 93.

[77] *Id.*

[78] Compl. ¶ 94.

used in the December 2013 Presentation, were based on "unfounded optimism."[79]

While Boyle admitted he did not know whether Genworth's LTC assumptions were right or wrong, he advised Klein that he "lacked confidence" in the assumptions and expressed his view that management needed to devise a process that would garner confidence in Genworth's numbers.[80] A month later, on July 16, 2014, Boyle reported his findings to the Audit Committee and stressed that the "margin disclosure made" in the December 2013 Presentation "may have been materially overstated."[81]

Notwithstanding Boyle's stated concerns, the Board met on July 28, 2014 to approve Genworth's 2Q 2014 financial statements.[82] The Board acknowledged that Patterson and Boyle had resigned, effective that same day, and recognized that since Boyle could not (and would not) attest to the adequacy of his division's internal controls, the Board was forced to rely on written representations from actuaries within Genworth's U.S. Life Insurance Division.[83] Groh also spoke about the LTC

---

[79] Compl. ¶ 95.

[80] Compl. ¶ 96.

[81] Compl. ¶ 97.

[82] Compl. ¶ 98.

[83] *Id.* I note that included in the materials provided to the Audit Committee ahead of this meeting was a July 25, 2014 report from PwC alerting the Board that it had been ignoring adverse claims experiences for years, although the report stated that Genworth's changes in claims management were "reasonable" at the time implemented. Compl. ¶ 100. Specifically, PwC reported: "Our 2012 Report stated that the 2012 DLR Refinement assumptions were insufficient relative to the 2009-2010 level. Genworth implemented changes in claims management that appeared to be effective in 2011 and assumed this

business in particular and flagged that the current DLR reserve was management's best estimate at the time, but further review could change some of the underlying assumptions.[84] After this meeting, and upon Boyle's resignation, McInerney was named CEO of the US Life Insurance Division.[85]

On July 30, 2014, Klein admitted publicly that Genworth "last performed an in-depth disabled life reserve review in the third quarter 2012—i.e., more than one year before the December 2013 Presentation."[86] He also admitted that Genworth's last review, in 2012, was "really based on experience that we had up through about 2010—i.e., more than three years before the December 2013 Presentation."[87] This revelation caused Genworth's stock price to plummet, falling 19.4% and eliminating over $1.5 billion in market capitalization.[88] Ultimately, on November 5, 2014, Genworth issued a press release announcing the results of its "comprehensive review

---

improvement would continue. While our report stated there is little evidence to support this viewpoint, we also noted that it is reasonable for management to assume their actions would be effective. Recent experience, however, has not returned to the pre-2009 level." *Id.*

[84] Compl. ¶¶ 98–99; *see* OB Ex. 39.

[85] Compl. ¶ 103.

[86] Compl. ¶ 106 (alterations and internal quotation marks omitted).

[87] *Id.* (internal quotation marks omitted).

[88] Compl. ¶ 107.

of its long term insurance claim reserves."[89]  The press release noted that the review of its post-May 2010 experience data "resulted in a need to make changes to its assumptions and methodologies primarily impacting claim terminations."[90]  Upon implementing these changes, the data showed that Genworth "was materially under-reserved and that [it] needed to increase reserves by $531 million and take an after-tax charge of $345 million in the quarter."[91]

8. **The Federal Securities Action Regarding the LTC Disclosures**

Following the November 5, 2014 press release, certain Genworth stockholders sued McInerney and Klein, but not the Board, in the United States District Court in the Eastern District of Virginia, alleging that both defendants violated Sections 10(b) and 20(a) of the Exchange Act by making materially false disclosures in connection with the December 2013 Presentation.[92]  On May 1, 2015, the court denied a motion to dismiss, finding the complaint alleged facts that allowed the court to conclude it was plausible McInerney and Klein had made five categories of knowingly false statements: (1) that Genworth had engaged in a "deep review" in the fall of 2013 of

---

[89] Compl. ¶ 116.

[90] *Id.* (internal quotation marks omitted).

[91] *Id.*

[92] Compl. ¶¶ 3, 142; *In re Genworth Fin., Inc. Sec. Litig.*, 103 F. Supp. 3d 759 (E.D. Va. 2015).

"all important aspects" of its business when, in reality, Genworth last conducted an in-depth review in 2012; (2) that Genworth was setting reserves based on current claims data when, in fact, it was using data from 2010 and earlier; (3) that Genworth's reserves were adequate notwithstanding that the 2.2-year average claim duration number used internally was based on old data; (4) that Genworth's financial statements complied with GAAP when, for the reasons already stated, they did not; and (5) that Genworth had effective internal controls notwithstanding that the Company knowingly utilized stale data to calculate reserves.[93]

On March 11, 2016, Genworth announced it had reached an agreement to settle the Virginia federal action for $219 million, paying $69 million from the coffers of the Company and the rest through insurers.[94]

## C. The Australian Mortgage Insurance Business

Genworth is a leading provider of mortgage insurance products in a variety of countries, including Australia.[95] The Company sells its products primarily to lender servicers and banks; in the event mortgage defaults go up, Genworth's claim payouts increase and profitability decreases.[96] On January 24, 2011, the Board was provided

---

[93] Compl. ¶ 5.

[94] Compl. ¶ 142.

[95] Compl. ¶ 143.

[96] *Id.*

a preliminary review of Genworth's Q4 2010 earnings and was informed the Australian mortgage insurance ("Australian MI") segment was down 37% year-over-year.[97] The Australian MI segment was also down 28% compared to the estimate set forth in its 2011 operating plan.[98] In the comments section of the slide deck used to facilitate the January 24 presentation, the Board was advised that the lower than expected results were not caused solely by weather-related events affecting the housing market, as some believed, but rather reflected structural changes in the Australian MI market as well.[99]

On March 16 and 17, 2011, Genworth's then-Chief Operating Officer and the Board discussed the strategic issues facing the Australian MI market and "how management intended to strengthen [Genworth's] business model in Australia."[100] Then, at a Board meeting on May 18, 2011, the Board was informed that "Queensland's economy was lagging, that delinquency rates in Queensland as well as across Australia were increasing, and that the Company needed to, *inter alia*, reassess its underwriting practices."[101] The Board also learned that the Australian

---

[97] Compl. ¶¶ 145–47.

[98] Compl. ¶ 147.

[99] Compl. ¶ 148.

[100] Compl. ¶ 149.

[101] Compl. ¶ 150.

22

Prudential Regulation Authority ("APRA") mandated that Genworth hold an additional $360 million in capital based on concerns with "the quality and concentration of Genworth's internal reinsurance."[102]

Meanwhile, the Board was advised that the Company's Australia Rating was under review by Moody's and that management had engaged in "significant dialogue with Moody's . . . to ensure that the Company's Australian unit would not be downgraded."[103] Notwithstanding the deteriorating nature of the business, on July 14, 2011, the Board met in executive session and unanimously agreed that "management should continue to analyze and actively explore certain capital raising/redeployment strategies" regarding Genworth's Australian MI segment.[104]

At a September 14, 2011 Board meeting, Fraizer briefed the Board on alternatives for the Australian MI business and led a discussion on the "status of the viability of a potential initial public offering" with respect to that division.[105] The Board also was advised of the "[c]hallenging macroeconomics and market conditions [that] impact Australia's valuation in both M&A and IPO markets."[106]

---

[102] Compl. ¶ 151.

[103] *Id.*

[104] Compl. ¶ 152.

[105] Compl. ¶ 153.

[106] *Id.*

By October 12, 2011, the Board had instructed management to discuss the potential for a minority IPO transaction with the APRA.[107]  Less than a month later, "[o]n November 3, 2011, Genworth publicly announced that it would make a partial sale of the Australian MI business by means of a minority (40%) IPO."[108]  Analysts viewed the prospect of Genworth's IPO as overwhelmingly positive.[109]

On December 7, 2011, Genworth's Chief Operating Officer provided an update to the Audit Committee regarding loss reserves for the Australian MI business.[110]  At this meeting, the Audit Committee (which later informed the Board) discovered that the Australian MI business had encountered delays in lender processing with resulting delays in the reporting of delinquencies, leading Genworth to underestimate its reserves.[111]  It is alleged the Board knew of these delinquencies and knew the Company was underreporting reserves.[112]

Notwithstanding the Board's alleged knowledge about lender processing delays and Genworth's inability correctly to estimate current delinquencies,

---

[107] Compl. ¶ 154.

[108] Compl. ¶ 155.

[109] *Id.*

[110] Compl. ¶ 156.

[111] *Id.*

[112] *Id.*

resulting in the inability to calculate its loss revenues, the Board and management continued to assure the market of the Australian MI business's stability.[113] In its Q4 2011 earnings release, delivered on February 2, 2012, the Company noted "a decrease in new delinquencies, including reductions in Queensland," but failed to mention its inherent inability to calculate accurately those delinquencies in the first place.[114]

At a Board meeting on March 14–15, 2012, the Board was informed that management was "re-evaluating IPO timing given multiple considerations."[115] According to Plaintiffs, in evaluating timing considerations, the Board was informed that APRA was requiring a supervisory levy of the Australian MI business and that a lower valuation of the business was "expected" within the timeframe contemplated for the IPO.[116] With these facts in hand, as of March 14–15, it is alleged the Board knew the IPO would not move forward as scheduled.[117]

On April 17, 2012, the Company announced in a press release that the Australian IPO would be delayed and that the Company "expect[ed] to report

---

[113] Compl. ¶ 164.

[114] *Id.*

[115] OB Ex. 10, at 02360; *see* Compl. ¶¶ 190–91.

[116] Compl. ¶¶ 190–91.

[117] *Id.*

elevated loss experience in Australia as lenders accelerated the processing of later-stage delinquencies from prior years[.]"[118] The following day Genworth's stock price declined by more than 23%.[119] The fact that this news was delivered "out of the blue" surprised many analysts, particularly given that the Australian MI business had "never reported an operating loss."[120]

On May 2, 2012, the CFO of Genworth's Global MI segment revealed the details of the precise loss in Q1 2012—the Australian MI business's loss ratio was 154%, up from 46% in the previous quarter.[121] This revelation led to a lawsuit in the United States District Court in the Southern District of New York, where Genworth stockholders sued Fraizer and Klein, as officers of Genworth, for violations of Sections 10(b) and 20(a) of the Exchange Act in connection with false statements they made regarding the financial health of the Australian MI business.[122] The complaint there survived a motion to dismiss and the litigation is ongoing.[123]

---

[118] Compl. ¶ 175.

[119] Compl. ¶ 177.

[120] Compl. ¶¶ 178–79.

[121] Compl. ¶ 180.

[122] Compl. ¶ 194.

[123] *Id.*

## D. Procedural History

Plaintiffs filed their initial complaint in this Court on January 13, 2016.[124] Plaintiffs exercised their right to amend without leave on March 28, 2016.[125] When Defendants moved to dismiss that complaint, Plaintiffs moved to amend, resulting in the filing of their (now operative) Second Amended Complaint.[126] The operative Complaint comprises two counts: Count I alleges Breach of Fiduciary Duty against all Defendants related to the LTC Business and Count II alleges Breach of Fiduciary Duty against all Defendants related to the Australian MI Business.[127]

Defendants promptly moved to dismiss the Complaint and contemporaneously filed their Opening Brief in support of the motion.[128] Plaintiff responded with a Motion to Stay on the grounds that Genworth had announced it would be acquired by merger and that the merger may eliminate Plaintiffs' derivative

---

[124] D.I. 1.

[125] D.I. 6.

[126] D.I. 28, 32.

[127] Compl. ¶¶ 215–22. As discussed below, Defendants made no effort to separate claims against the individual Defendants and, importantly, made no effort to separate claims against the Director Defendants and the Officer Defendants.

[128] D.I. 36.

27

standing.[129] Defendants opposed the requested stay and, after argument, the Court declined to stay the action.[130]

The Court heard oral argument on the motion to dismiss on February 20, 2017.[131] Shortly after the hearing, the parties requested that the Court defer deciding the motion to dismiss while Genworth negotiated the previously announced merger.[132] The parties repeated that request several times thereafter over the course of more than three years.[133] On April 26, 2021, the parties advised the Court that the merger would not go forward and offered to provide supplemental submissions regarding the motion to dismiss.[134] The last of those submissions was filed on June 18, 2021, and the matter was deemed submitted for decision that day.[135]

---

[129] D.I. 48.

[130] D.I. 49, 61.

[131] D.I. 70.

[132] D.I. 71.

[133] D.I. 73–76, 84–88, 90–98.

[134] D.I. 99.

[135] D.I. 107.

## II. ANALYSIS

Plaintiffs endeavored to plead demand futility under *Rales* by alleging that a majority of the Board in place at the time the Complaint was filed face a substantial likelihood of liability for breaching their duty of loyalty by consciously allowing management to mislead investors regarding the state of Genworth's LTC insurance and Australian MI businesses.[136]  But Plaintiffs have incorporated by reference in their Complaint Board-level documents that plainly contradict their demand futility allegations.  These documents bely any inference of conscious wrongdoing by making clear that the Board properly relied upon the Company's independent auditor, KPMG, and the Company's internal auditors, regarding the adequacy of the LTC reserves and the accuracy of the public disclosures regarding those reserves. As to the Australian MI business, the properly incorporated documents reveal the Board did not know if the IPO would be delayed until immediately before the delay was announced, and, as with the LTC claims, the Board properly relied upon outside expert advice during every step of the IPO process.  Thus, Plaintiffs have failed to

---

[136] *Rales v. Blasband*, 634 A.2d 927 (Del. 1993).  The Court notes our Supreme Court recently modified the demand futility analysis. *See United Food & Com. Workers Union v. Zuckerberg*, 250 A.3d 862 (Del. Ch. 2020), *aff'd*, 2021 WL 4344361 (Del. Sept. 23, 2021).  As discussed below, the modification does not affect the analysis here.

plead particularized facts showing that demand upon the Board is excused. Defendants' motion to dismiss the Complaint, therefore, must be granted.

## A. The Demand Futility Standard

"A cardinal precept of the General Corporation Law of the state of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation."[137] Plaintiffs' claim against all Defendants for breach of fiduciary duty alleges harm suffered by Genworth itself, and any recovery for that harm would flow to Genworth. Thus, the claim belongs to Genworth and the decision whether to pursue the claim presumptively lies with the Board.[138] With that said, our law recognizes that, "[i]n certain circumstances, stockholders may pursue litigation derivatively on behalf of the corporation as a matter of equity to redress the conduct of a torpid or unfaithful management . . . where those in control of the company refuse to assert (or are unfit to consider) a claim belonging to it."[139]

---

[137] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

[138] *White v. Panic*, 783 A.2d 543, 550 (Del. 2001) ("In most situations, the board of directors has sole authority to initiate or to refrain from initiating legal actions asserting rights held by the corporation."); *Brookfield Asset Mgmt., Inc. v. Rosson*, 2021 WL 4260639, at *8 (Del. Sept. 20, 2021) (confirming that, in Delaware, our courts look to who suffered the harm and who will benefit from any recovery when assessing whether a claim is direct or derivative).

[139] *In re CBS Corp. S'holder Class Action & Deriv. Litig.*, 2021 WL 268779, at *27 (Del. Ch. Jan. 27, 2021), as corrected (Feb. 4, 2021) (quoting *Cumming v. Edens*, 2018 WL 992877, at *11 (Del. Ch. Feb. 20, 2018) (internal quotation marks omitted)).

"Because stockholder derivative suits by [their] very nature . . . impinge on the managerial freedom of directors, our law requires that a stockholder satisfy the threshold demand requirements of Court of Chancery Rule 23.1 before he is permitted to assume control of a claim belonging to the corporation."[140] Rule 23.1, like Rule 9(b) in the context of fraud, requires pleadings to "comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings governed solely by Chancery Rule 8(a)."[141] To meet the Rule 23.1 requirements, the stockholder must plead with particularity either that she made a demand on the company's board of directors to pursue particular claims or why any such demand would be futile, thereby excusing the need to make a demand altogether.[142] Where, as here, the stockholder plaintiff chooses the latter path, she "must plead particularized facts creating a reasonable doubt concerning the Board's ability to consider the demand."[143] "The operative question is therefore whether

---

[140] *Horman v. Abney*, 2017 WL 242571, at *6 (Del. Ch. Jan. 19, 2017) (cleaned up).

[141] *Brehm*, 746 A.2d at 254; *In re The Boeing Co. Deriv. Litig.*, 2021 WL 4059934, at *21 (Del. Ch. Sept. 7, 2021) (same).

[142] *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1044 (Del. 2004); *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008); *In re The Boeing Co.*, 2021 WL 4059934, at *21. Chancery Rule 23.1(a) reads, in part, that "[t]he complaint shall . . . allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors . . . and the reasons for the plaintiff's failure to obtain the action or for not making the effort." Ct. Ch. R. 23.1(a).

[143] *In re CBS*, 2021 WL 268779, at *28.

31

'demand is excused because the directors are incapable of making an impartial decision regarding whether to institute such litigation.'"[144]

Until very recently, Delaware applied one of two tests in determining demand futility. "The first, established in *Aronson v. Lewis*, 'applie[d] to claims involving a contested transaction i.e., where it is alleged that the directors made a conscious business decision in breach of their fiduciary duties.'"[145] The second and broader test, established in *Rales v. Blasband*, applied where a majority of the members of the board "had not participated in the challenged decision,"[146] or, more commonly, "where the subject of a derivative suit is not a business decision."[147] Over time, however, Delaware courts favored the broad applicability of *Rales* over the inflexibility of *Aronson*.[148] Indeed, the Wolfe & Pittenger treatise observes:

---

[144] *Zuckerberg*, 250 A.3d at 877 (citing *Stone v. Ritter*, 911 A.2d 362, 367 (Del. 2006)).

[145] *In re The Boeing Co.*, 2021 WL 4059934, at *22; *Aronson*, 473 A.2d at 814. Under *Aronson*, the plaintiff must plead particularized facts that create a reasonable doubt that (i) the directors are disinterested and independent or (ii) the challenged transaction was otherwise the product of a valid exercise of business judgment. *Wood*, 953 A.2d at 140.

[146] *Zuckerberg*, 250 A.3d at 887.

[147] *Wood*, 953 A.2d at 140; *see also Horman*, 2017 WL 242571, at *6 (holding that *Rales* applies "when a plaintiff challenges board inaction such as when a board is alleged to have consciously disregarded its oversight duties").

[148] *E.g.*, *Zuckerberg*, 250 A.3d at 877 ("Both tests remain authoritative, but the *Aronson* test has proved to be comparatively narrow and inflexible in its application, and its formulation has not fared well in the face of subsequent judicial developments. The *Rales* test, by contrast, has proved to be broad and flexible, and it encompasses the *Aronson* test as a special case."); *see id.* at 886 ("Delaware's evolving jurisprudence, and particularly

32

> [O]ne might argue . . . that it would be both simpler and more direct to regard the original *Aronson* analysis as a subpart of the more generally applicable and consistently relevant test set forth in *Rales*. Indeed, recent decisional law seems to be trending incrementally toward a recognition of and preference for the more efficient utility of the *Rales* analysis.[149]

This trend has reached a denouement. In *United Food and Commercial Workers v. Zuckerberg*, Vice Chancellor Laster amalgamated *Aronson* with *Rales* to form a three-part test.[150] In doing so, he carefully identified certain analytical shortcomings of *Aronson* that have limited its utility, particularly in the wake of Section 102(b)(7) exculpation for duty of care violations, before proposing *Rales* as a general framework for all demand futility claims.[151] "This decision therefore applies *Rales* as the general demand futility test," he wrote, but "[i]n doing so, this decision draws upon *Aronson*-like principles."[152] Now, for each director, when conducting a demand futility analysis, Delaware courts ask:

(i)     whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;

---

the pleading-stage application of Section 102(b)(7) under *Cornerstone*, have dismantled the logic of *Aronson*. Viewed on its own terms, *Aronson* is no longer a functional test.").

[149] 2 Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 11.03[c][4], 11-114–15 (2d. ed. 2020).

[150] *Zuckerberg*, 250 A.3d at 890.

[151] *Id.* at 877–91.

[152] *Id.* at 890.

(ii)    whether the director would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand; and

(iii)   whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that is the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.[153]

Just days ago, our Supreme Court expressly adopted the *Zuckerberg* test in a unanimous *en banc* decision.[154]  The Court observed, "[s]ubsequent changes in the law have eroded the ground upon which [*Aronson*'s] framework rested," before concluding, "it is both appropriate and necessary that the common law evolve in an orderly fashion to incorporate those developments."[155]  The purpose of the demand futility analysis remains the same—to determine "whether the board should be deprived of its decision-making authority because there is reason to doubt that the directors would be able to bring their impartial business judgment to bear on a

---

[153] *Id.*

[154] *United Food & Com. Workers Union v. Zuckerberg*, 2021 WL 4344361, at *2 (Del. Sept. 23, 2021).

[155] *Id.* at *16.

34

litigation demand."[156] Importantly, "the refined test does not change the result of demand-futility analysis."[157] Thus, I apply *Zuckerberg* but achieve the same result as would be yielded under the traditional *Rales* framework.

"On a motion to dismiss pursuant to Rule 23.1, the Court considers the same documents, similarly accepts well-pled allegations as true, and makes reasonable inferences in favor of the plaintiff—all as it does in considering a motion to dismiss under Rule 12(b)(6)."[158] Because Rule 23.1 requires a heightened pleading standard, however, conclusory allegations "not supported by allegations of specific fact may not be taken as true."[159] In this case, because the Complaint cites documents Plaintiffs obtained through their Section 220 demand, I may consider those documents under the incorporation-by-reference doctrine to determine whether the Complaint has accurately referenced their contents in support of Plaintiffs' claims and in pleading demand futility.[160]

---

[156] *Id.*

[157] *Id.* Accordingly, I am satisfied that supplemental briefing on *Zuckerberg* is unnecessary.

[158] *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 833 A.2d 961, 976 (Del. Ch. 2003), *aff'd*, 845 A.2d 1040 (Del. 2004) (citing *White*, 783 A.2d at 549).

[159] *Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988) (cleaned up).

[160] *Reiter ex rel. Cap. One Fin. Corp. v. Fairbank*, 2016 WL 6081823, at *5–6 (Del. Ch. Oct. 18, 2016); *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 797 (Del. Ch. 2016). Stockholder plaintiffs routinely, as of late, argue that when a defendant attaches a number of documents, including Section 220 documents, to its motion to dismiss, the motion should be converted to a motion for summary judgment. *See Flannery v. Genomic Health,*

The gravamen of this Complaint's demand futility allegations is that a majority of the Board is interested under prong 2 of the *Rales* (now *Zuckerberg*) test because of its (1) complicit participation in allowing management to give false disclosures regarding Genworth's LTC business and (2) lackadaisical willingness to allow the minority IPO of the Australian MI segment to move forward on false pretenses notwithstanding its knowledge of the segment's dire financial straits. Plaintiffs argue these breaches of fiduciary duty by a majority of the Board that would consider a demand were "of a nature that would expose [them] to 'a substantial likelihood' of personal liability,"[161] excusing demand under *Rales* (and now prong 2 of *Zuckerberg*). To determine whether the Board is so exposed,

---

*Inc. et al.*, 2021 WL 3615540, at *8 (Del. Ch. Aug. 16, 2021); *Acero Cap., L.P. v. Swrve Mobile, Inc.*, 2021 WL 2207197 (Del. Ch. June 1, 2021); *In re CBS*, 2021 WL 268779, at *18; *In re Clovis Oncology, Inc. Deriv. Litig.*, 2019 WL 4850188, at *14 (Del. Ch. Oct. 1, 2019). Here, perhaps given the lack of prevalence of this position at the time this motion was briefed and argued, Plaintiffs have not argued for conversion, notwithstanding Defendants' attachment of over 50 exhibits in support of their motion. With that said, the Court will adhere to the confines of the incorporation by reference doctrine. Incorporation by reference "does not enable a court to weigh evidence on a motion to dismiss. [Instead,] [i]t permits a court to review the actual documents to ensure that the plaintiff has not misrepresented their contents and that any inference the plaintiff seeks to have drawn is a reasonable one." *Voigt v. Metcalf*, 2020 WL 614999, at *9 (Del. Ch. Feb. 10, 2020).

[161] *Horman*, 2017 WL 242571, at *6 ("Particularized facts create a reasonable doubt of the board's independence and disinterestedness when the demand would reveal board inaction of a nature that would expose the board to 'a substantial likelihood' of personal liability." (quoting *Rales*, 634 A.2d at 936)).

36

the Court must first identify precisely what Plaintiffs allege these fiduciaries did wrong.

## B. *Caremark* or Something Else?

Throughout this litigation, the parties struggled to characterize Plaintiffs' claims. Plaintiffs initially pled this case as a breach of the duty of loyalty by fiduciaries acting in bad faith,[162] while Defendants' motion to dismiss framed the claims as arising under *Caremark*.[163] In their answering brief, Plaintiffs stated that "Defendants mischaracterize Plaintiffs' claims regarding the Australian MI units as so-called '*Caremark* claims,'"[164] and instead maintained they were alleging "knowing and intentional misconduct by the Board."[165] In reply, Defendants asserted that Plaintiffs "abandoned" their *Caremark* claims and that their "new theory"—that Genworth's directors knowingly facilitated false and misleading statements about Genworth's LTC business and the Australian IPO—likewise fails as a matter of law.[166]

---

[162] Compl. ¶¶ 213–22.

[163] OB at 51–62.

[164] Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss the Second Am. Compl. ("AB") (D.I. 58), at 52.

[165] *Id.* at 53.

[166] Defs.' Reply Br. in Supp. of Mot. Dismiss the Second Am. Compl. ("RB") (D.I. 62), at 7–8.

Confusion persisted at oral argument. Defendants stated that the claims originally appeared to them as "straightforward *Caremark* claims" but that Plaintiffs' pleading characterized them as "conscious wrongdoing" and therefore "no longer [residing] in *Caremark* land."[167] Defendants offered the view that the "conscious wrongdoing" accusations required an even higher standard of pleading akin to fraud. In response, Plaintiffs' counsel allowed that "our claim is that the board of directors consciously allowed the company to violate the law, which is a *Caremark* claim,"[168] only to be reminded that in their answering brief they were equally adamant that their claims did *not* arise under *Caremark*.[169] Given the tumult regarding the true basis for Plaintiffs' asserted claims, I address that issue first, albeit briefly, before turning to whether Plaintiffs have well-pled a basis to excuse demand under any theory of liability.

---

[167] Transcript of Oral Argument at 7:12, 11:7, 16, *Genworth Fin., Inc. Consol. Deriv. Litig.* (Del. Ch. Feb. 20, 2017) (C.A. No. 11901-VCS).

[168] *Id.* at 71:19–21.

[169] *Id.* at 72: 19–24, 73:1–3 ("Mr. Laughlin: I think for ease of analysis, the idea that they're all *Caremark* claims is a reasonable framework, with the caveat being made that the—The Court: Just so I can—this is page 52, and this is a quote. 'Caremark is inapplicable, however, because the directors there had no reason to know . . . the liability-inducing conduct at issue.'").

## 1. *Caremark*

In *Caremark*, Chancellor Allen held that directors could be liable for a "sustained or systematic failure of the board to exercise oversight."[170] As highlighted by this court many, many times since *Caremark*,[171] the claim that corporate fiduciaries have breached their duties to stockholders by failing to monitor corporate affairs is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."[172] A decade after *Caremark*, our Supreme Court clarified that our law will hold directors personally liable only where, in failing to oversee the operations of the company, "the directors knew that they were not discharging their fiduciary obligations."[173] Given that a claim grounded in *Caremark* is derivative, at the pleadings stage, a plaintiff must allege particularized facts that satisfy one of the necessary conditions for director oversight liability articulated in *Caremark*: either that (1) "the directors utterly failed to implement any

---

[170] *Caremark*, 698 A.2d at 971.

[171] *See Teamsters Loc. 443 Health Servs. & Ins. Plan v. Chou*, 2020 WL 5028065, at \*1 (Del. Ch. Aug. 24, 2020) ("It has become among the hoariest of Chancery clichés for an opinion to note that a derivative claim against a company's directors, on the grounds that they have failed to comply with oversight duties under *Caremark*, is among the most difficult of claims in this Court to plead successfully.").

[172] *Caremark*, 698 A.2d at 967; *Globis P'rs, L.P. v. Plumtree Software, Inc.*, 2007 WL 4292024, at \*7 (Del. Ch. Nov. 30, 2007) (same); *Desimone v. Barrows*, 924 A.2d 908, 939 (Del. Ch. 2007) (same); *Guttman v. Huang*, 823 A.2d 492, 506 n.33 (Del. Ch. 2003) (same).

[173] *Stone*, 911 A.2d at 370.

39

reporting or information system or controls"; or (2) "having implemented such a system or controls, [the directors] consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention."[174]

"Delaware courts routinely reject the conclusory allegation that because illegal behavior occurred, internal controls must have been deficient, and the board must have known so."[175] Rather, the plaintiff must plead with particularity "a sufficient connection between the corporate trauma and the board."[176] To draw that connection, the plaintiff must well-plead facts that allow an inference that the directors' behavior falls within either prong one (no oversight system or controls) or prong two (failure to oversee once controls are in place) of *Caremark*.[177]

The *Caremark* standard "draws heavily upon the concept of director failure to act in good faith."[178] As our Supreme Court explained in *Disney*, the "intentional dereliction of duty" or "conscious disregard for one's responsibilities," which "is

---

[174] *Id.*

[175] *Desimone*, 924 A.2d at 940.

[176] *La. Mun. Police Emps.' Ret. Sys. v. Pyott*, 46 A.3d 313, 340 (Del. Ch. 2012), *rev'd on other grounds*, 74 A.3d 612 (Del. 2013).

[177] *Stone*, 911 A.2d at 370.

[178] *Id.* at 369.

40

more culpable than simple inattention or failure to be informed of all facts material to the decision," reflects that directors have acted in bad faith and cannot, by default, avail themselves of defenses grounded in a presumption of good faith.[179] In order to plead a derivative claim under *Caremark*, therefore, a plaintiff must plead particularized facts that allow a reasonable inference the directors acted with scienter which, in turn, "requires [not only] proof that a director acted inconsistent[ly] with his fiduciary duties," but also "most importantly, that the director knew he was so acting."[180]

## 2. *Caremark* **Not Pled Here**

Here, Plaintiffs have not alleged that a majority of the director Defendants violated their *Caremark* duties by failing to implement an oversight system under prong one; indeed, they allege functionally the opposite—that the Board was informed throughout regarding Genworth's false and misleading disclosures and yet still endorsed them.[181] To state the obvious, this means there is no allegation the Board utterly failed to implement any reporting or information system or controls.

---

[179] *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 66 (Del. 2006).

[180] *In re Massey Energy Co.*, 2011 WL 2176479, at *22 (Del. Ch. May 31, 2011).

[181] Compl. ¶¶ 46–48, 56, 65, 69, 74–77, 87–89, 97–98, 101–02, 114–15, 124, 132 (each detailing distinct Board meetings where the Board was kept informed about the Company's LTC-related problems).

"To state a 'prong two' *Caremark* claim, Plaintiff must 'plead [particularized facts] that the board knew of evidence of corporate misconduct—the proverbial 'red flag'—yet acted in bad faith by consciously disregarding its duty to address that misconduct.'"[182]  Here again, that is not what Plaintiffs have alleged.  Indeed, the substance of Plaintiffs' claim is *not* that the Board missed red flags, as to either the LTC or Australian MI business, but rather that the Board had direct knowledge of the contemporaneous wrongdoing *and participated in it* by endorsing the false and misleading disclosures and allowing them to stand uncorrected.  This is not a *Caremark* claim.

To be sure, the claim as pled here is *Caremark*-like, and some of our decisions—including my own—have glossed over this distinction and analyzed similar claims under prong two of *Caremark*.[183]  This is understandable given that

---

[182] *Chou*, 2020 WL 5028065, at *17 (quoting *Reiter*, 2016 WL 6081823, at *8) (alterations in original).

[183] *See, e.g.*, *Clovis Oncology*, 2019 WL 4850188, at *13–14 (holding that plaintiffs well-pled a claim under *Caremark* prong 2 when the board allegedly knew management was incorrectly and illegally reporting material information to the market and regulators); *In re Am. Int'l Gp., Inc.*, 965 A.2d 763, 799 (Del. Ch. 2009) *aff'd sub nom. Teachers' Ret. Sys. of La. v. PricewaterhouseCoopers LLP*, 11 A.3d 228 (Del. 2011) (stating that the plaintiffs well-pled a breach of the duty loyalty based on a failure to "monitor or oversee" when AIG's inner circle ran a "criminal organization"); *Chou*, 2020 WL 5028065, at *1–2, 7 (holding in part that the plaintiffs well-pled a *Caremark* prong 2 claim when the illegal business model was allegedly "known to and approved at the highest levels" of the company); *South v. Baker*, 62 A.3d 1, 6 (Del. Ch. 2012) ("[D]irectors can be held liable under [*Caremark*] for *knowingly causing or consciously permitting* the corporation to violate positive law, or for failing utterly to attempt to establish a reporting system or other

the scienter element of an oversight claim looks very much like the bad faith that undergirds an allegation that a fiduciary has knowingly participated in a violation of law.

But the prong two *Caremark* claim alleges that the fiduciary "consciously disregarded" a red flag that warned of corporate malfeasance. That is very different from what Plaintiffs have alleged here. According to Plaintiffs, Genworth's fiduciaries engaged in conduct even more pernicious; they picked up the proverbial red flag and led the charge as the Company knowingly violated federal disclosure laws.[184] This is not *Caremark*; it is, instead, a far less nuanced claim that Defendants

---

oversight mechanism . . . a plaintiff asserting a *Caremark* claim must plead facts sufficient to establish board involvement in *conscious wrongdoing . . .*") (emphasis added).

[184] As Plaintiffs themselves summarized, "[we], therefore, do not allege a *Caremark . . .* claim; rather, [we] allege *knowing and intentional misconduct by the Board*." AB at 53 (emphasis added); *see id.* at 57 ("Rather than missing 'red flags' . . . , Plaintiffs allege that the Board *knew* the status of the Australian MI unit, *knew* its information regarding delinquencies in Australia was unreliable, and yet, *failed* to act to prevent the Company from consistently issuing false and misleading statements regarding the health of the Company's Australian business.") (emphasis in original); *id.* at 34–35 ("[T]he [Complaint] alleges that Defendants consciously allowed Genworth and McInerney to make numerous false and misleading statements about the Company's LTC business in violation of the federal securities laws."); Compl. ¶ 217 ("Defendants breached their fiduciary duties by willfully and/or recklessly: knowingly permitting a breakdown of Genworth's internal controls . . . ; authorizing Genworth's public announcements and SEC filings which they knew or recklessly disregarded understated [sic] the Company's reserves to the investing public, in violation of GAAP and the federal securities laws and regulations; and prompting its executives to knowingly and repeatedly make false assurance to the investing public regarding the adequacy of the Company's LTC reserves and reserving processes."). Plaintiffs make a nearly identical allegation concerning the Australian MI business. Compl. ¶ 221.

43

acted in bad faith in breach of their duty of loyalty by causing the Company to engage in fraud in violation of positive law.[185]

Having clarified what claim Plaintiffs have alleged, and what claim they have not alleged, I turn next to whether they have well-pled that a majority of the demand Board face a substantial likelihood of liability under *Zuckerberg* such that demand upon the Board is excused.[186]

---

[185] *See* 1 Robert S. Saunders et al., *Folk on the Delaware General Corporation Law* § 141.02[A][3][a], 4-41 (7th ed. 2021) ("The fiduciary duty of loyalty includes a requirement to act in good faith, which is 'a subsidiary element, *i.e.*, a condition, of the fundamental duty of loyalty.'") (citing *Stone*, 911 A.2d at 370)); *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 33 (Del. Ch. 2014) ("A plaintiff can call into question a director's loyalty by showing that the director . . . [intentionally] failed to pursue the best interests of the corporation and its stockholders and therefore failed to act in good faith."); *In re AIG*, 965 A.2d at 798 (finding a breach of the duty of loyalty when one is "being directly complicitous in various fraudulent schemes"); *Disney*, 906 A.2d at 67 (bad faith includes "act[ing] with the intent to violate applicable positive law") (citing *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 755 (Del. Ch. 2005) (Chandler, C.)); *In re Massey Energy*, 2011 WL 2176479, at *20 (holding "a fiduciary of a Delaware corporation cannot be loyal to a Delaware corporation by knowingly causing it to seek profit by violating the law"); *Guttman*, 823 A.2d at 506 n.34 ("[O]ne cannot act loyally as a corporate director by causing the corporation to violate the positive laws it is obliged to obey."); Leo E. Strine, Jr. et al., *Loyalty's Core Demand: The Defining Role of Good Faith in Corporation Law*, 98 Geo. L. J. 629, 650–51 (2010) ("No agent can act loyally toward a principal by undertaking . . . consciously unlawful activity in the name of the principal.").

[186] Before *Zuckerberg*, there was conflicting authority on whether purposeful inaction by a Board was analyzed under the *Aronson* or *Rales* framework. *See, e.g.*, *In re China Agritech, Inc. S'holder Deriv. Litig.*, 2013 WL 2181514, at *23 (Del. Ch. May 21, 2013) (applying *Aronson* because "[t]he conscious decision not to take action was itself a decision."); *In re Dow Chem. Co. Deriv. Litig.*, 2010 WL 66769, at *6 (Del. Ch. Jan. 11, 2010) ("For conscious board decisions—whether to act or not—the two-pronged *Aronson* test applies. A board's failure to act absent a conscious decision to refrain from acting, such as a failure to supervise, is analyzed under *Rales*.") (footnotes omitted). *But see In re Duke Energy Corp. Deriv. Litig.*, 2016 WL 4543788, at *15 (Del. Ch. Aug. 31, 2016) (applying *Rales* instead of *Aronson* to directors' failure to correct inaccurate disclosures and noting

## C. The LTC Claims

As relates to Genworth's LTC business, Plaintiffs point to three areas where they allege the Board knew of bad acts and nevertheless endorsed them. First, Plaintiffs allege the Board should have prevented or corrected McInerney's statement to investors on December 4, 2013, that the Company had recently completed a "very intensive, broad and deep review" of its LTC reserves. Second, Plaintiffs allege the Board consciously allowed McInerney falsely to disclose to the market that Genworth's reserves were calculated using current claims data and that Genworth's LTC reserves were adequate. Finally, Plaintiffs allege the Board consciously allowed SEC filings, with their signatures, to be false with respect to Genworth's compliance with GAAP and the adequacy of its internal controls. I address each in turn.

### 1. McInerney's "Deep Review" Comment

At the December 4, 2013 meeting with investors, McInerney declared that Genworth had "completed the very intensive, broad and deep review of [its] long-term care insurance business."[187] This statement followed earlier statements from

---

the struggle in picking between the two and "the folly of regarding those two analyses as the components of a binary choice"); *In re Intel Corp. Deriv. Litig.*, 621 F. Supp. 2d 165, 173 (D. Del. 2009) (applying *Rales* in a case of "conscious inaction" by the board). The implementation of a single test for demand futility, like *Zuckerberg*, solves this problem.

[187] Compl. ¶ 79 (alteration in original).

McInerney, including on October 30, 2013, to the effect that Genworth had "beg[u]n an intensive, very broad and deep review of all aspects of [our] long-term care business about 4 months ago."[188]  I assume for the sake of analysis that Plaintiffs have well-pled the statements were false.[189]  But they have failed to well-plead that the Board had any reason to believe the statements were false or, for that matter, knew that McInerney would make or had made those statements.

It is true, as Plaintiffs allege, that Riepe admitted in the federal action that the 2013 LTC review "was not a deep dive."[190]  And one might reasonably infer that the other members of the Board appreciated that there was a distinction between a "deep dive" and a more cursory management review of a business unit.[191]  Indeed, at the

---

[188] Compl. ¶ 66 (alteration in original).

[189] I note that in the federal action pending in Virginia, Judge Spencer found, on an arguably more rigorous pleading standard than is applicable here, that McInerney's statements during investor calls and in SEC filings, as pled, were false. *In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 773–74, 785–86 (E.D. Va. 2015).  This includes comments regarding the recency of claims data and that Genworth performed a deep review of the LTC business in 2013.  Judge Spencer did not address, however, whether the plaintiffs there had well-pled that members of the Board knowingly participated or acquiesced in the false statements.

[190] Compl. ¶ 6.  Plaintiffs' suggestion that Riepe's acknowledgement that the 2013 LTC review "was not a deep dive" somehow suggests that the entire Board shared that understanding ignores our law that a plaintiff must plead facts "*specific to each director*" because "Delaware law does not permit the wholesale imputation of one director's knowledge to every other for demand excusal purposes."  *Desimone*, 924 A.2d at 943 (emphasis in original).

[191] Compl. ¶ 37.

Board meeting on March 14–15, 2012, the Board received a presentation regarding PwC's "long term care deep dive."[192] Even so, contrary to Plaintiffs' allegations, the minutes reflect that management advised the Board near the culmination of the review in October 2013 that it had performed an "extensive review" before discussing their conclusions with the Board (including regarding LTC reserves) at length.[193] There is simply no well-pled fact that would allow an inference the Board had any reason to doubt that representation.[194]

---

[192] OB Ex. 10, at 02346. I note the succeeding page of the slide deck further illustrated an in-depth review of the process, suggesting the Board understood what a "deep dive" was.

[193] OB Ex. 27, at 07171 (Oct. 9–10, 2013 Board Minutes) (cited in Compl. ¶ 65).

[194] Plaintiffs attempt to invoke the "core operations" doctrine as a means to justify an inference that the Board "must have known" McInerney was pushing false information to the market regarding the LTC business because of the "significance of the LTC reserves" to Genworth's business. *See* AB at 41; *Pfeiffer v. Toll*, 989 A.2d 683 (Del. Ch. 2010) (recognizing that in certain limited circumstances corporate fiduciaries can be charged with knowledge of matters related to the corporation's "core operations"). That argument falls short. *Pfieffer* expressly recognized that it is not reasonable to charge non-management directors with knowledge of highly complex or technical matters that require special skill or knowledge to understand. *Id.* at 693. The setting of insurance loss reserves certainly falls into that category. As disclosed in the Company's Form 10-Ks, Genworth's reserves "reflect estimates and actuarial assumptions with regard to [Genworth's] future experience," which "involve the exercise of significant judgment" because Genworth's "actual future experience" may not be "consistent with the assumptions" relied upon by management. OB, Ex. 1, at 61 (Mar. 3, 2014 Form 10-K); OB, Ex. 2, at 63 (Feb. 28, 2013 Form 10-K) (same); OB, Ex. 3, at 62 (Feb. 27, 2012 Form 10-K) (same). PCAOB Auditing Standards reflect this complexity by acknowledging that outside auditors "may encounter complex or subjective matters" that "require special skill or knowledge" and require "using the work of a specialist to obtain appropriate evidential matter," including the "[d]etermination of amounts derived by using specialized techniques or methods (for example . . . determinations for insurance loss reserves)." PCAOB Auditing Standards AU § 336.07, *Using the Work of a Specialist* (1994).

47

Moreover, Plaintiffs fail to well-plead that a single Board member other than McInerney, much less a majority of the Board, knew McInerney would or did make the "deep review" statement to investors, even when the pled facts are viewed in a light most favorable to Plaintiffs. According to the Complaint, the Board received the slides for the December 2013 Presentation on November 21,[195] but there is no allegation those slides gave notice of McInerney's intent to tell investors that Genworth had engaged in a deep review of its LTC business. At the November 25 meeting, ahead of the December 2013 Presentation, the Board discussed the proposed debt offering and the draft slides, but again, there was no mention that McInerney planned to tell investors the Company had engaged in a "deep review."[196] Then, on December 12–13, the Board was briefed on the *reception* of the December 2013 Presentation, including the "positive reaction from analysts" and that the presentation "solidified management assertions on reserve adequacy and raised credibility."[197] There is no indication, however, that any aspect of the discussions revealed to the Board that McInerney had misrepresented to investors the extent to which the Company had studied the state of its LTC business.

[195] Compl. ¶ 69.

[196] Compl. ¶¶ 74–77.

[197] Compl. ¶¶ 86–87.

"[A] director cannot be put on 'inquiry notice by something he or she never saw or heard.'"[198]

### 2. McInerney's Comments Regarding "Current" Claims Experience Data and the Adequacy of LTC Reserves

In advance of the December 2013 Presentation, the Board was provided a copy of the slide deck that McInerney intended to review with investors. This slide deck contained numerous statements Plaintiffs allege are false: (1) that "all data" was current "as of September 30, 2013," (2) that the company revised its "actuarial assumptions" as "circumstances warranted . . . based on [its] monitoring of actual experience," and (3) that "margins remain strong in the aggregate under key sensitivities."[199] Each statement was false, say Plaintiffs, because the claims data was not current, was not updated, and deeply affected the margins.

I again assume for the sake of analysis that Plaintiffs have well-pled these statements were false. The question remains, however, whether Plaintiffs have well-pled the Board knew of the falsity and nevertheless allowed McInerney to make fraudulent statements to investors.

---

[198] *Horman*, 2017 WL 242571, at *27 n.61 (citing *In re Citigroup Inc. S'holders Litig.*, 2003 WL 21384599, at *2 (Del. Ch. June 5, 2003)).

[199] Compl. ¶¶ 70, 72.

49

To answer the question, the Court must address two issues. First, are there particularized allegations regarding the Board's independent knowledge of Genworth's failure to update its claims data? Second, even if the Board had some sense of this failure, does the fact that KPMG gave "clean," unqualified audit opinions year-after-year, including with respect to Genworth's Consolidated Balance Sheets and Consolidated Statements of Cash Flows, which included LTC reserves, coupled with management's constant assurances to the Board that LTC reserves were being adequately addressed, absolve the Board of liability under 8 *Del. C.* § 141(e) as a matter of law?[200]

As to the Board's knowledge, Plaintiffs allege the Board knew LTC claims lasted an average of approximately three years (2.9 years to be exact), as disclosed in the Company's SEC filings for 2010–2012.[201] Yet, for the 2009 10-K, the Board, then consisting of Defendants Karch, Mead, Moloney, Parke and Riepe, approved language disclosing the average claim duration was approximately two years

---

[200] I note that the failure to update claims data is the foundation of Plaintiffs' assertion that any statement regarding the adequacy of reserves was also false. "To the extent that an LTC insurance company's experience data is inconsistent with its original inputs, the company must change its estimates assumptions and, where necessary, increase its reserves." Compl. ¶ 44. For that reason, I focus on the claims (experience) data only.

[201] Compl. ¶ 73 (noting how the Board "documented this fact in their annual reports filed with the SEC for 2010, 2011, and 2012, as well as various other filings with the SEC").

(2.2 years to be exact).[202] Moreover, say Plaintiffs, a 2014 PwC report reveals that, in 2012, PwC informed the Board that Genworth's "DLR Refinement assumptions were insufficient relative to the 2009-2010 level."[203]

What Plaintiffs leave out, however, is that same 2014 PwC report also noted there was "no evidence that management did not look at all the evidence available in reaching their judgments or that management ignored relevant data [in 2012]," and emphasized that the 2012 reserve assumptions "were based on reasonable, supportable and explicit management assumptions regarding trends and expected results from their business plan."[204] Contrary to the inferences Plaintiffs would have me draw, none of their pled facts allow a reasonable inference that the Board had any reason to doubt management's assurances or otherwise know that Genworth continued to use stale data up to the point of either the December 2013 Presentation or the release of the 2013 Form 10-K.

But even if one could draw an inference that the Board was aware of a concern that management was relying upon some stale data in setting reserves, KPMG and

---

[202] *Id.* Defendants offer credible arguments, based on properly incorporated documents, that Genworth did not set DLR reserves based on "average claim duration" but, instead, relied upon "termination rates." OB at 49–50. I need not address those arguments, however, as the claim fails on other grounds.

[203] Compl. ¶¶ 37, 73.

[204] OB Ex. 40, at 06324. And, of course, it is hard to miss that the 2014 PwC report was created the year after the December 2013 presentation.

management were in the room and contributed mightily to the Board's understanding of these issues. Neither sounded alarm bells. While Plaintiffs understandably seek to plead KPMG and management's involvement out of the Board minutes, those minutes do not allow those allegations to stand as well-pled. "[D]irectors of Delaware corporations are fully protected in relying in good faith on the reports of officers and experts."[205] More specifically, "independent directors are entitled to rely in good faith on advice from the auditors that corporate books and records are accurate and GAAP-compliant and that corporate internal controls are adequate."[206]

Plaintiffs do not contend that the setting of insurance loss reserves is a simple task, and for good reason—the task is complicated and requires extensive input from actuaries, accountants and other experts to get it right.[207] The chief actuary of the

---

[205] *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 132 (Del. Ch. 2009); 8 *Del. C.* § 141(e) ("A member of the board of directors, or a member of any committee designated by the board of directors, shall, in the performance of such member's duties, be fully protected in relying in good faith upon the records of the corporation and upon such information, opinions, reports or statements presented to the corporation by any of the corporation's officers or employees, or committees of the board of directors, or by any other person as to matters the member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation.").

[206] *In re AIG*, 965 A.2d at 828 n.246.

[207] *See* OB Ex. 1, at 61 (Mar. 3, 2014 Form 10-K); OB Ex. 2, at 63 (Feb. 28, 2013 Form 10-K); OB Ex. 3, at 62 (Feb. 27, 2012 Form 10-K); PCAOB Auditing Standards AU § 336.07, *Using the Work of a Specialist* (1994).

LTC business, John Nigh, confirmed to the Board at the November 25, 2013 meeting, as explained by the meeting minutes (on which Plaintiffs substantially rely),[208] that the actuarial team had participated in developing the December 2013 Presentation and was comfortable with the LTC numbers presented.[209] While Plaintiffs argue the Board should have been "on suspicion that something [was] wrong" with the claims data prior to this point, the facts from properly incorporated documents simply do not bear that out.[210]

KPMG had certified Genworth's financial statements and internal controls in 2012 and 2013, providing the Board further solace that nothing nefarious was afoot.[211] Going back further, on December 7, 2011, the date of an Audit Committee meeting during which Plaintiffs claim the Audit Committee was briefed on the problems regarding Genworth's current LTC experience data, the Audit Committee was also alerted by Genworth's Chief Actuary that the LTC reserving process was "at an advanced level," a sentiment shared by PwC.[212] Throughout 2012, the Board

---

[208] Compl. ¶¶ 69, 74–78, 81.

[209] OB Ex. 28.

[210] *In re Baxter Int'l, Inc. S'holders Litig.*, 654 A.2d 1268, 1270 (Del. Ch. 1995) (citing *Graham v. Allis-Chalmers Mfg. Co.*, 188 A.2d 125, 130 (Del. Super. 1963)).

[211] OB Ex. 2–3.

[212] OB Ex. 17, at 01932.

53

was constantly alerted by management, with KPMG present and in agreement, of potential control issues and how the Company was addressing them.[213] This continued into 2013 when, during a February 25, 2013 Board meeting to review the 2012 10-K, Genworth's controller and KPMG advised the Board that there were no material weaknesses and the financial statements and controls of the Company were consistent with GAAP and SOX.[214] These assurances were repeated again in 2014 with regard to the 2013 10-K.[215]

In short, despite Plaintiffs' claims that Defendants knew the claims data was stale and, nevertheless, consciously allowed McInerney to mislead investors by referring to it, those allegations find no support in well-pled facts. Instead, the facts reveal the Board did not know the data was stale, and even if it had some suspicion, reassurances from those closer to and with more knowledge of the matter reasonably would have quelled any concerns.

### 3. SEC Filings Regarding the Adequacy of Reserves and Compliance with GAAP

The next set of allegations is more of the same, but they relate to Genworth's 2013 Form 10-K. Here, Plaintiffs allege that the document falsely disclosed that it

---

[213] Compl. ¶ 37 (noting Board discussions in early 2012), ¶¶ 50–51 (noting Board discussions on October 29 and December 5, 2012); OB Ex. 19–21.

[214] Compl. ¶ 56; OB Ex. 14.

[215] OB Ex. 13, at 07248; Compl. ¶ 88.

was prepared "in accordance with GAAP" and that the Company "calculated and maintained reserves for estimated future payments of claims to our policyholders and contract holders in accordance with U.S. GAAP and industry accounting principles."[216] Plaintiffs also take issue with the 10-K's statement that Genworth "monitored actual experience, and when circumstances warrant, revised [its] assumptions."[217] Finally, Plaintiffs point to the SOX Certification declaring that Genworth's internal controls were effective and functioning properly.[218]

Here again (and likely more so), the fact that KPMG approved of the 10-K through an audit, both as to financials and controls, scuttles any reasonable inference that the director Defendants acted in bad faith when approving the 2013 10-K. KPMG made clear in its audit findings that "no material weaknesses had been identified during 2012" and again, regarding the second quarter of 2013, "there were no material weaknesses" such that KPMG was "comfortable with the contents of the Corporation's Form 10-Q."[219] Delaware law requires directors to be informed, but it does not demand that informed directors reject their auditor's repeated assurances

---

[216] Compl. ¶ 90.

[217] Compl. ¶ 91.

[218] *Id.*

[219] OB Ex. 26, at 04913.

regarding complicated aspects of a Company's public filings, such as reserve levels and GAAP compliance.[220]

## D. The Australian MI Claims

Plaintiffs allege Board members breached their duty of loyalty by waiting to announce a delay of the minority IPO until the last minute and by allowing the Company to mislead the market regarding the true state of its reserves and how they would affect the upcoming IPO. These claims, too, must be dismissed.[221]

Put simply, the dispositive question here is whether the Board knew Genworth planned to delay the IPO prior to its announcement on April 17, 2012. Plaintiffs' claim in this regard turns on information relayed to the Board at its March 14–15, 2012 meeting, where the Board purportedly was informed by management that the IPO would be delayed.[222] Importantly, the minutes from that meeting, properly incorporated by reference, reflect that there was no definitive discussion or

---

[220] *See, e.g.*, 8 *Del. C.* § 141(e); *In re Citigroup*, 964 A.2d at 132.

[221] Notwithstanding Plaintiffs' improper group pleading, I note that Conrad, McInerney, Moffet and Higgins did not join the Board until after the events that are the gravamen of Plaintiffs' allegations with respect to the Australian MI business. Compl. ¶¶ 199, 203, 205–06, 209.

[222] Compl. ¶¶ 190–91 (citing the CEO & CFO report presented to the Board during the meeting).

suggestion by either management or Genworth's financial advisor, Goldman Sachs, that the IPO would have to be delayed.[223]

The Complaint references the CEO & CFO report delivered to the Board at the meeting, but that report, once again, does not support the inference Plaintiffs would have me draw.[224] According to Plaintiffs, the report reflects: potential problems with performing an IPO in Q2 2012, namely that APRA was requiring a supervisory levy; that management knew an expected lower value would reduce redeployment opportunities, forgo value and signal weakness; and that management was no longer briefing or providing draft prospectus to syndicate analysts in early March.[225] When read in the only reasonable context, however, these comments in the CEO & CFO Report simply flags the "cons" in a comprehensive "pros and cons" analysis with respect to the launch of an IPO in Q2 2012. On the very same slide where these comments appear, the CEO & CFO Report also highlights several

---

[223] OB Ex. 9, at 00204 ("Mr. Pehota then provided an update on the *proposed* minority initial public offering of the Corporation's Australia mortgage insurance subsidiary. At this juncture, the representatives from Goldman Sachs also joined the meeting by teleconference. Mr. Lopez-Balboa then reviewed the key valuation and timing considerations for the Australia IPO. Mr. Fraizer then noted *certain other potential alternatives* for continued portfolio re-positioning. The Board engaged in discussion regarding the Australian IPO and asked questions, to which management and the representatives from Goldman responded.") (emphasis added).

[224] *Id.*

[225] Compl. ¶ 191.

"pros" to keeping the IPO on schedule for Q2 2012.[226] Nothing about this "pros and cons" analysis supports a reasonable inference that the Company had definitively resolved to delay its IPO when the Board was apprised of the issue. Accordingly, it is not reasonable to infer the Board should have required management to make a public statement regarding a delayed IPO following the March 2012 Board meeting.[227]

The only reasonable inference to draw from well-pled facts is that the Board was advised for the first time regarding the need for delay at its April 17, 2012 meeting, where management reported that the "*recent* emergence of adverse trends on number of paid claims [and] claim severity" justified a decision to put off the IPO.[228] At that same meeting, management advised the Board that management "viewed [the] transaction as *executable* based on everything [management] know[s]—but not before business trends confirm what [Genworth] *experienced in the first quarter* is a concentrated transitional event."[229] The Company announced

---

[226] OB Ex. 10, at 02364.

[227] *See Red Oak Fund, L.P. v. Digirad Corp.*, 2013 WL 5740103, at *17 (Del. Ch. Oct. 23, 2013) ("A possible decision that might be reached several weeks away is far too speculative for the Court to require disclosure, even during a proxy contest.").

[228] Compl. ¶ 172 (emphasis added).

[229] OB Ex. 11, at 02514 (emphasis added).

that the IPO would be delayed the next day.[230] Nothing about this sequence permits an inference of bad faith.

While the timing issues were the focus of the Complaint and Plaintiffs' arguments in opposition to the motion to dismiss, I note that Plaintiffs seek to hold the Board accountable for more than the timing of the IPO as relates to the Australian MI Business. They allege the health of that business segment, particularly with respect to the adequacy of reserves, had been misstated publicly, both by executives and in securities filings, and the Board knew this and was complicit in the failure to correct the false information.[231] These allegations fail for the same reason as earlier claims; management gave repeated assurances to the Board that it was employing "a disciplined approach to updating [Genworth's] quarterly reported loss reserves,"[232] all while Goldman Sachs was in the room and KPMG confirmed the adequacy of Genworth's financials and controls as reflected in the 2012 10-K.[233]

---

[230] OB Ex. 12 (Apr. 17, 2012 Genworth Form 8-K).

[231] Compl. ¶¶ 156, 160–62, 164–65, 180–83.

[232] OB Ex. 7, at 01936 (Dec. 7, 2011 Australia & [Redacted] Mortgage Insurance Reserves Update); *see also id.* at 01937 (reflecting the Company's CFO's assurances that any "reporting lag" in the then-existing data "has been consistently applied and should not materially impact [Genworth's] loss reserves in normal environments").

[233] *E.g.*, OB Ex. 3 (Genworth 2012 10-K), Ex. 9 (Mar. 14–15, 2012 Board Minutes).

The pleadings do not point to facts that would allow a reasonable inference the Board should have questioned the Company's experts' opinions and recommendations.[234]

## E. The Complaint Makes No Discernable Claims Against the Officers

Plaintiffs named several officers as Defendants and went so far as to define them collectively as "Executive Defendants."[235] Beyond using the definition to describe an individual, the Complaint makes no further mention of "Executive Defendant(s)." Indeed, there are no specific allegations directed against the Officers and there are no separate claims asserted against them either.

A plaintiff must adequately plead a breach of fiduciary duty claim "against each individual director or officer; so-called 'group pleading' will not suffice."[236] Plaintiffs have resorted to group pleading throughout their Complaint. While that was not the primary problem with their claims against the so-called Director Defendants, it is the problem with their claims, to the extent they intended to bring

---

[234] *See Wood*, 953 A.2d at 142 ("The Board's execution of . . . financial reports, without more, is insufficient to create an inference that the directors had actual or constructive notice of any illegality."). A complaint must "plead with particularity the specific conduct in which each defendant 'knowingly' engaged, or that the defendants knew that such conduct was illegal." *Id.*

[235] Compl. ¶¶ 25–27.

[236] *Raj & Sonal Abhyanker Fam. Tr. ex rel. UpCounsel, Inc. v. Blake*, 2021 WL 2477025, at *4 (Del. Ch. June 17, 2021) (citing *In re USG Corp. S'holder Litig.*, 2020 WL 5126671, at *23 (Del. Ch. Aug. 31, 2020)).

them, against the "Executive Defendants."  Given the blunt nature of the pleading, it is not surprising the parties' briefs barely mention the Executive Defendants and do not join issue on whether the Complaint states viable claims against them.  Since the Officers are named as defendants, they are entitled to a clear finding that the claims against them, if there are any, are likewise dismissed under Chancery Rule 12(b)(6).

## III.  CONCLUSION

Because Plaintiffs have not pled with particularity that Defendants face a substantial likelihood of liability, demand is not excused.  Defendants' motion to dismiss, therefore, must be GRANTED.

**IT IS SO ORDERED**.